## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | **Criminal No. 16-000276-WS** |
| | * | |
| **WILLIE JOHN WELLS** | * | |

### FACTUAL RESUME

The abovecaptioned defendant admits the allegations of Count 2 of the Indictment.

### ELEMENTS OF THE OFFENSES

**Count Two:** The defendant understands that in order to prove a violation of Title 21,

United States Code, Section 846, conspiracy to possess with intent to distribute

methamphetamine, a Schedule II controlled substance, the United States must prove the

following beyond a reasonable doubt:

first, that two or more individuals came to a mutual understanding to commit an unlawful

act, in this case, the possession with intent to distribute methamphetamine; and second, that the

defendant, knowing of the unlawful purpose of the plan, knowingly and intentionally joined in

the plan. The Government must also prove that more than 50 grams of methamphetamine were

involved in the offense.

### OFFENSE CONDUCT

The defendant admits in open court and under oath that the following statement is true

and correct and constitutes evidence in this case. This statement of facts is provided solely to

assist the Court in determining whether a factual basis exists for his plea of guilty. The

statement of facts does not contain each and every fact known to the defendant and to the United

States concerning the defendant's involvement in the charges set forth in the plea agreement.

1

**Facts**

The investigation resulted from an arrest of two subjects at a residence in Mobile where officers of the Mobile County Street Enforcement Narcotics Team (MCSENT) had been conducting surveillance. They had stopped a vehicle leaving the house and identified its occupants as having outstanding arrest warrants on federal charges involving methamphetamine. One of the subjects provided information on a source of supply subsequently identified as Willie John Wells. He agreed to place a call for the officers to obtain methamphetamine on March 31, 2016. The call was not recorded. Wells agreed and he and Gerald Griffin, aka Rick, both showed up at the meeting with 10 ounces of methamphetamine ice. They were taken into custody and the drugs were seized. Wells and Griffin had a room at the Jemison Inn. When police traveled to that location to pursue the investigation, Griffin's girlfriend was there, and she told the police that there was another room at the Hampton Inn, room 306. Officers obtained consent to search the rooms, and the officers discovered additional incriminating evidence.

Wells identified a white male called "Rider," subsequently identified as Ryan Scott Burkhardt, as one of his distributors for the distribution of large amounts of methamphetamine ice. Wells claimed that Burkhardt owed him some money on a drug debt for a five-ounce meth transaction that occurred a few days earlier. Hotel records established that date as March 18. In giving information about Burkhardt, Wells described him as having numerous weapons and explosives. MCSENT officers called upon ATFE to participate in the investigation in the event that such items were discovered. The officers asked Wells to call Burkhardt to bring the money to him. This call was recorded. The meeting location was to be the Waffle House in Grand Bay. Burkhardt went to the wrong Waffle House, and there was a delay while he traveled to the correct

2

one. There were two other phone calls between Wells and Burkhardt which were not recorded, in which they discussed and changed the meeting location. ATFE SA W.V. was involved in the investigation at this time, as Burkhardt was supposed to be in possession of firearms and explosives. Agent W.V. and a Mobile police officer were in an unmarked vehicle and were involved in the plan to arrest Burkhardt when he arrived at the meeting location.

Burkhardt pulled in the parking lot on a motorcycle and drove to the back. Officers pulled in behind him and activated their blue lights. Burkhardt immediately sped around them on the motorcycle and headed south on Highway 90 toward the interstate. He turned into a parking lot just before he got to the interstate and officers followed him there. Burkhardt eventually lost control of the motorcycle, wrecked it, and fled on foot into an open area behind a business on Highway 90. Mobile Police Officer Z.D. was chasing Burkhardt on foot and caught up with him. When Officer Z.D. grabbed Burkhardt, Burkhardt reached under his arm and pulled a .40 caliber semi-automatic pistol from a shoulder holster. He fired at Officer Z.D. at close range, striking him in the lower torso and in the leg. At that time, Agent W.V. was about 15 yards away from Burkhardt and Officer Z.D. Other officers returned fire at Burkhardt and he was eventually subdued. When officers took Burkhardt into custody, they seized his gun and discovered he was wearing a bullet-proof vest. His motorcycle helmet, which he was still wearing, also protected his head during the shoot-out. He was wounded in one shoulder, both arms and one foot. Burkhardt and Officer Z.D. were treated at the scene and transported to an area hospital for further treatment. Officer Z.D. had received life-threatening injuries as a result of the gunshots fired by Burkhardt, and he underwent emergency surgery for his injuries. He was listed in the hospital at that time as critical but stable.

3

Burkhardt was discharged from the hospital on April 6, and he was transported to Mobile Police Department headquarters. He was advised of his constitutional rights and he stated that he understood his rights and agreed to answer questions. Burkhardt initially claimed he did not know that it was police officers pursuing him and he was acting in self-defense. During the conversation with the police detectives, however, he subsequently admitted that he saw the blue lights and the police markings. He expressed remorse for shooting the officer. When he was leaving police headquarters to be transported to metro jail, he made statements to the media claiming that he was under the influence of methamphetamine when he shot the officer and again expressed remorse for the shooting.

In the ensuing investigation, Burkhardt's gun had been seized as evidence. The officers obtained information from Wells and Griffin about Burkhardt's residence, a facility off Highway 90 in Irvington they identified as "the Boatyard." The officers prepared an affidavit for a state search warrant and traveled to that location to execute the warrant. They found three people present, one of whom was a property owner. They seized three guns, but received information from one of those present that other guns and drugs were moved offsite prior to the arrival of the officers. They located a female identified as Burkhardt's girlfriend, L.M. She identified a purple suitcase as Burkhardt's bag. It contained men's clothing and 5 ounces of methamphetamine ice. The officers also located a blue truck that Burkhardt used when he was not on the motorcycle. They obtained another search warrant for that vehicle.

Griffin also provided a post-Miranda statement. Griffin stated that on March 29, he brought 12 ounces of meth ice to Mobile. He stated that he gave 10 ounces to Burkhardt and 2 ounces to Wells. He drove back to Philadelphia, Mississippi, where he resides, and retrieved

4

another 15 ounces. Wells had previously given 6 ounces to Burkhardt, and Griffin wanted to meet him. They met face to face on the 10 ounces. When Griffin got back to Philadelphia, Wells called him back and told him that Burkhardt wanted 10 more ounces and Wells wanted another five ounces. When Griffin arrived in Mobile with the 15 ounces, Wells decided to keep the 10 ounces and deliver the remaining five to Burkhardt. Those drugs were recovered from the hotel room after Wells and Griffin were arrested.

L.M. admitted to the officers that she was a meth user and that she knew Burkhardt was a meth dealer. She identified "Mark" and "Bo" as meth dealers who were getting ice from Burkhardt. She stated that they moved the safe from the Boatyard and took guns and drugs out of it.

Officers identified Mark as Mark Jowers Jr. They identified his residence on Highway 90, and executed a search warrant there on April 1. Jowers was present and admitted that the took three handguns from Burkhardt's residence. The guns were recovered from his vehicle. Jowers claimed that he had permission to stay at the residence, the Boatyard, from the property owner. He claimed that when the property owner and L.M. were both coincidentally gone from the property, he took that opportunity to look around and discovered Burkhardt's safe. He said he took it to the back of the property, busted it open and took the guns. Approximately 7 grams of methamphetamine was also discovered during the search and Jowers was arrested on state felony drug possession charges. In a post-Miranda statement to ATFE agents, Jowers admitted that he had obtained small amounts of meth ice from Burkhardt in the past. He had answered Burkhardt's phone at Burkhardt's instruction and spoke to "W" on the phone, to inform "W" that Burkhardt was busy. He stated that he knew Burkhardt was going to meet "W" to pay for drugs. Jowers

subsequently admitted that he knew Burkhardt's sources of supply for methamphetamine were two black males, one from Irvington and another from Philadelphia called "Wayne."

Boman also gave a post-Miranda statement admitting his involvement with Burkhardt at the boat yard and assisting him in various ways, including acts in furtherance of the drug distribution. Boman was also a drug user, and admitted trying to get all evidence which might incriminate Burkhardt away from the property. Three of Burkhardt's guns were concealed in Jowers' vehicle and a fourth was concealed at another location on the property. ATFE recovered all of those guns, but some of Burkhardt's guns are still unaccounted for.

A second search warrant was executed at an address on Alice Drive in Theodore. The property owner there was interviewed. The officers recovered a gun and lock box, but no drugs from that location. The officers also seized a stolen vehicle at that location.

Wells, Griffin and Jowers were all arrested on state charges. MPD Homicide detectives responded to the scene of the shooting to collect evidence and conduct an investigation into the state charges of attempted murder. They located video at the Waffle House, the TA Truck Stop, a nearby gas station and a private business which happened to be equipped with night vision video equipment. All the phones were recovered and they were examined as the result of consent searches or search warrants. The phones show contacts relating to prior drug deals but nothing specific as to the incident involving the shooting, which was arranged through Wells' cooperation with the police.

On April 7, 2016, MCSO deputies were dispatched to a business in Semmes when a caller reported that the owner had a live grenade. The owner informed deputies that she believed her boyfriend bought two the other day. She directed the deputies to a closed plastic

6

box.   The deputy opened the box and observed two hollow grenades and a blasting cord that read "caution explosives."   There were also blasting caps and some rocket fuel caps in the case. The deputy evacuated everyone from the building and reported these events.   The MPD Bomb Detail responded along with ATFE agents.   The explosive materials were made safe and turned over to ATFE agents, who submitted it to the laboratory for further analysis.   The reports reflected that some of these materials were consistent with a combination of parts form which two explosive weapons, commonly known as improvised hand grenades, may be readily assembled.   Once assembled, lighting the pyrotechnic fuse inserted in the hole in the grenade fuze body would, after a short delay, ignite the explosive powder contained in the grenade body, resulting in an explosion.   Explosive grenades are destructive devices as defined in Title 26, United States Code, Section 5845(f).   The explosive detonators were not manufactured in the state of Alabama, and therefore, possession of them in Alabama affected interstate commerce.

The business owner turned over videotape which depicted the person who brought these items to the business on or about April 5, 2016.   The subject depicted in the video was subsequently identified as Johnny Lee Crooker.   Crooker was interviewed by ATFE agents on April 1, April 7 and April 8, 2016.   Crooker was advised of his rights each time and he signed a rights waiver and agreed to talk to the agents.

Crooker admitted he took two grenade hulls and some other items from the Boatyard to the business in Semmes and sold them there.   He claimed he had found the explosive components in Burkhardt's shed.   He admitted that he had seen a white male and a black male visit the boatyard to meet with Burkhardt.   Crooker also admitted that on one such occasion, Burkhardt was not there and Crooker talked to them.   One of them asked Crooker if he needed

7

anything and showed him a quantity of methamphetamine ice a little bit larger than a golf ball. Crooker denied ever seeing a drug transaction between Burkhardt and these subjects, but he admitted he knew that they were there for drug transactions. Crooker positively identified Wells and Griffin from photo lineups as the subjects who visited Burkhardt at the boatyard. Crooker characterized the people coming to get meth ice from Burkhardt as constant, "24/7." Crooker admitted that he received meth ice from Burkhardt but claimed that he used it all.

Crooker admitted that he was present on the property when Mark Jowers broke into the safe. Crooker stated that Jowers peeled back the door to the safe and duped out the contents. Crooker stated he saw several firearms spread out on the floor, but denied having received any of the guns. Crooker described seeing a silver handgun on the shelf built into the door of the shed. Crooker believed that Jowers put the gun there. Crooker also admitted that "Bo" was present that same morning. He said he saw "Bo" exit the back of the house with a green duffle bag full of long guns. Crooker said "Bo" left the property with these items in a white Ford Mustang.

Crooker signed a consent to search for his room and his vehicle. He admitted there may be a small amount of methamphetamine in his room. Crooker admitted that he handled several firearms at the Boatyard, and claimed he was only moving them out of his way because they were everywhere.

ATFE agents determined that Burkhardt, Jowers, Boman and Crooker were all convicted felons. The guns recovered from Jowers and Boman were not manufactured in Alabama. As noted above, the materials Crooker sold to the business in Semmes were analyzed by the ATFE lab and found to be explosive materials regulated by law.

The parties agree that Wells is accountable for 37 ounces of methamphetamine ice as

8

relevant conduct, and that the Government can prove that amount beyond a reasonable doubt.

AGREED TO AND SIGNED.

Respectfully submitted,

STEVEN E. BUTLER
ACTING UNITED STATES ATTORNEY

Date: 3/13/17

Vicki M. Davis, Criminal Chief
Assistant United States Attorney

Date: 3/10/17

Gloria A. Bedwell
Assistant United States Attorney

Date: 3/14/17

Willie John Wells
Defendant

Date: 3/14/17

Peter Madden, Esq.
Attorney for Defendant

9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | **Criminal No. 16-000276-WS** |
| | * | |
| WILLIE JOHN WELLS | * | |

### PLEA AGREEMENT

The abovecaptioned defendant, represented by his counsel, and the United States of

America have reached a plea agreement in this case, pursuant to Rule 11 of the Federal Rules of

Criminal Procedure, the terms and conditions of which are as follows:

### RIGHTS OF THE DEFENDANT

1.    The defendant understands his rights as follows:

    a.    To be represented by an attorney;

    b.    To plead not guilty;

    c.    To have a trial by an impartial jury;

    d.    To confront and cross-examine witnesses and to call witnesses and

        produce other evidence in his defense; and

    e.    To not be compelled to incriminate himself.

### WAIVER OF RIGHTS AND PLEA OF GUILTY

2.    The defendant waives rights b through e, listed above, and pleads guilty to Count

2 of the Indictment, charging a violation of Title 21, United States Code, Section

846, conspiracy to possess with intent to distribute methamphetamine ice.

3.    The defendant understands that the statements he makes under oath in the plea of

1

guilty must be completely truthful and that he can be prosecuted for making false statements or perjury, or receive a perjury enhancement at sentencing, for any false statements he makes intentionally in this plea of guilty.

4.  The defendant expects the Court to rely upon his statements here and his response to any questions that he may be asked during the guilty plea hearing.

5.  The defendant is not under the influence of alcohol, drugs, or narcotics. He is certain that he is in full possession of his senses and is mentally competent to understand this Plea Agreement and the guilty plea hearing which will follow.

6.  The defendant has had the benefit of legal counsel in negotiating this Plea Agreement. He has discussed the facts of the case with his attorney, and his attorney has explained to the defendant the essential legal elements of the criminal charge which has been brought against him. The defendant's attorney has also explained to the defendant his understanding of the United States' evidence and the law as it relates to the facts of his offense.

7.  The defendant understands that the United States has the burden of proving each of the legal elements of the criminal charge beyond a reasonable doubt. The defendant and his counsel have discussed possible defenses to the charge. The defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice of his attorney.

8.  A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing. The Factual Resume is incorporated by reference into this Plea Agreement. The defendant and the United States agree

2

that the Factual Resume is true and correct. Alterations to the Plea Agreement or Factual Resume initialed only by the defendant and his counsel are not part of this agreement and are not agreed to by the United States.

9.    This plea of guilty is freely and voluntarily made and is not the result of force, threats, promises, or representations, apart from those representations set forth in this Plea Agreement. There have been no promises from anyone as to the particular sentence that the Court will impose. The defendant is pleading guilty because he is guilty.

10.   The defendant also knowingly and voluntarily waives all rights, whether asserted directly or through a representative, to receive from the United States after sentencing any further records, reports, or documents pertaining to the investigation or prosecution of this matter. This waiver includes, but is not limited to, rights under the Freedom of Information Act and the Privacy Act of 1974.

## PENALTY

11.   The maximum penalty the Court could impose on Count 1 of the Indictment is:

a.    10 years to life imprisonment;

b.    A fine not to exceed $10,000,000;

c.    A term of supervised release of 5 years, which would follow any term of imprisonment. If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;

d.    A mandatory special assessment of $100;

3

e.    Criminal forfeiture.

## SENTENCING

12.    The Court will impose the sentence in this case. The United States Sentencing
Guidelines are advisory and do not bind the Court. The defendant has reviewed
the application of the Guidelines with his attorney and understands that no one
can predict with certainty what the sentencing range will be in this case until after
a pre-sentence investigation has been completed and the Court has ruled on the
results of that investigation. The defendant understands that at sentencing, the
Court may not necessarily sentence the defendant in accordance with the
Guidelines. The defendant understands that he will not be allowed to withdraw
his guilty plea if the advisory guideline range is higher than expected, or if the
Court departs or varies from the advisory guideline range.

13.    The defendant understands that this Plea Agreement does not create any right to
be sentenced in accordance with the Sentencing Guidelines, or below or within
any particular guideline range, and fully understands that determination of the
sentencing range or guideline level, or the actual sentence imposed, is solely the
discretion of the Court.

14.    The United States will provide all relevant sentencing information to the
Probation Office for purposes of the pre-sentence investigation. Relevant
sentencing information includes, but is not limited to, all facts and circumstances
of this case and information concerning the defendant's conduct and background.

15.    Both the defendant and the United States are free to allocute fully at the time of

4

sentencing.

16.     The defendant agrees to tender $100 to the U.S. District Court Clerk in

satisfaction of the mandatory special assessments in this case. The United States

reserves the right to withdraw any favorable recommendations it may agree to

within this document if the defendant fails to pay the special assessment prior to

or at the time of his sentencing.

## FORFEITURE

17.     The defendant agrees to confess the forfeiture to the United States of all

properties which represent proceeds of his criminal activities or which facilitated

any aspect of these illegal activities.

## FINANCIAL OBLIGATIONS

18.     The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit

report in order to evaluate the defendant's ability to satisfy any financial

obligation imposed by the Court. In order to facilitate the collection of financial

obligations to be imposed in connection with this prosecution, the defendant

agrees to disclose fully all assets in which the defendant has any interest or over

which the defendant exercises control, directly or indirectly, including those held

by a spouse, nominee or other third party.

## UNITED STATES' OBLIGATIONS

19.     The United States will not bring any additional charges against the defendant

related to the facts underlying the Indictment and will move to dismiss all

remaining counts once sentence is imposed. This agreement is limited to the

United States Attorney's Office for the Southern District of Alabama and does not
bind any other federal, state, or local prosecuting authorities.

20.     The United States will recommend to the Court that the defendant be sentenced at
the low end of the advisory sentencing guideline range as determined by the
Court.

### APPLICATION OF U.S.S.G. § 5K1.1 AND/OR FED.R.CRIM.P. 35

21.     The defendant understands and agrees that he has no right to cooperate, and that
the decision whether to allow him to cooperate is reserved solely to the United
States in the exercise of its discretion. If the United States agrees to allow the
defendant to cooperate, and if the defendant agrees to cooperate, the following
terms and conditions apply:

a.     The defendant shall fully, completely, and truthfully respond to all
questions put to him by law enforcement authorities regarding the
underlying facts of the offense(s) with which he is charged, as well as the
underlying facts of any criminal offense(s), state or federal, of which he
has information or knowledge.

b.     The defendant acknowledges that he understands that he shall provide
truthful and complete information regarding any offense about which he
has knowledge or information regardless of whether law enforcement
authorities question him specifically about any such offense. This
provision requires the defendant to divulge all information available to
him even when law enforcement authorities do not know about the

6

defendant's involvement, knowledge or information relating to any
particular offense. This requirement extends to any and all persons about
whom the defendant has such knowledge or information.

c.     The defendant agrees to cooperate completely with all law enforcement
authorities in any matters to which his cooperation may be deemed
relevant by any law enforcement authority. The defendant agrees to fully
comply with all instructions from law enforcement authorities regarding
the specific assistance he shall provide. This includes, but is not limited
to, consenting to monitored and/or recorded telephone conversations,
participating in undercover operations, testifying completely and truthfully
before any grand jury, at any pre-trial proceeding, during any trial, and
any post-trial proceeding.

d.     If the United States deems it necessary, the defendant may be required to
take a polygraph examination(s) which will be administered by a
government polygrapher. The defendant agrees that the results of any
polygraph examination may be used by the United States in its evaluation
of whether there has been substantial assistance, and are admissible at
sentencing to rebut an assertion by the defendant of bad faith or
unconstitutional motive on the part of the United States.

e.     The defendant agrees to turn over to the United States any and all
documents, tapes and other tangible objects which are in his possession or
under his control and which are relevant to his participation in and

7

knowledge of criminal activities, regardless of whether it relates to the

charged offense. This obligation is a continuing one and includes

materials that the defendant may acquire, obtain or have access to after the

execution of this agreement.

f.      The defendant also agrees to identify the assets of any other person which

were obtained through or facilitated the defendant's illegal activities or the

illegal activities of another.

g.      If the defendant provides full, complete, truthful and substantial

cooperation to the United States, which results in substantial assistance to

the United States in the investigation or prosecution of another criminal

offense, a decision specifically reserved by the United States in the

exercise of its sole discretion, then the United States agrees to move for a

downward departure in accordance with Section 5K1.1 of the United

States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal

Procedure, whichever the United States deems applicable. The United

States specifically reserves the right to make the decision relating to the

extent of any such departure request made under this agreement based

upon its evaluation of the nature and extent of the defendant's cooperation.

The defendant understands that the United States will make no

representation or promise with regard to the exact amount of reduction, if

any, the United States might make in the event that it determines that the

defendant has provided substantial assistance. The defendant understands

8

that a mere interview with law enforcement authorities does not constitute substantial assistance. The defendant also understands that, should he provide untruthful information to the United States at any time, or fail to disclose material facts to the United States at any time, or commits a new criminal offense, the United States will not make a motion for downward departure. If the defendant's effort to cooperate with the United States does not amount to substantial assistance as determined solely by the United States, the United States agrees to recommend that the defendant receive a sentence at the low end of the advisory guideline range.

h.    The United States and the defendant agree that any breach of this agreement by the defendant, including but not limited to committing a new offense, failing to cooperate, intentionally withholding information, giving false information, committing perjury, failing to identify assets obtained by him from his illegal activities or obtained by others associated with him or of which he has knowledge, refusing to take a polygraph examination, failing a polygraph examination, or refusing to testify before the grand jury or at any judicial proceeding, would:

(1)    permit the United States to reinstate and proceed with prosecution on any other charges arising from the matters underlying the Indictment; and

(2)    permit the United States to initiate and proceed with the prosecution on any other charges arising from a breach of this

9

agreement. The United States will not be limited, in any respect,

in the use it may make against the defendant of any information

provided by the defendant during his breached cooperation. Such

breach will constitute a waiver of any claim the defendant could

make under the United States Constitution, the Federal Rules of

Evidence, the Federal Rules of Criminal Procedure, or any statute

or case law by which the defendant seeks to suppress the use of

such information or any evidence derived from such information.

i.     Nothing in this agreement shall protect the defendant in any way from

prosecution for any offense committed after the date of this agreement,

including perjury, false declaration, false statement, and obstruction of

justice, should the defendant commit any of these offenses during his

cooperation. The defendant acknowledges and agrees that the information

that he discloses to the United States pursuant to this agreement may be

used against him in any such prosecution.

j.     The United States and the defendant agree that the defendant will continue

his cooperation even after he is sentenced in the instant matter. His failure

to continue his cooperation will constitute a breach of this agreement, and

the defendant agrees that under such conditions, the United States will be

free to reinstate the charges and the prosecution of the charges in the

Indictment, which are to be dismissed in accordance with this agreement.

Under these circumstances, the defendant expressly waives any rights he

10

may have under the statute of limitations and the speedy trial provisions.

## LIMITED WAIVER OF RIGHT TO APPEAL AND
## WAIVER OF COLLATERAL ATTACK

22.   As part of the bargained-for exchange represented in this plea agreement, and

subject to the limited exceptions below, the defendant knowingly and voluntarily

waives the right to file any direct appeal or any collateral attack, including a

motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255.

Accordingly, the defendant will not challenge his guilty plea, conviction, or

sentence (including a sentence imposed on revocation of probation or supervised

release) in any district court or appellate court proceedings.

a.   **EXCEPTIONS.**  The defendant reserves the right to timely file a direct

appeal challenging:

(1)   any sentence imposed in excess of the statutory maximum;

(2)   any sentence which constitutes an upward departure or variance

from the advisory guideline range.

In addition, the defendant further reserves the right to claim ineffective

assistance of counsel in a direct appeal or a petition filed pursuant to Title

28, United States Code, Section 2255.

23.   If the United States files a notice of appeal and such appeal is authorized by the

Solicitor General, the defendant is released from the appellate waiver.

24.   The defendant further reserves the right to timely move the district court for an

amended sentence under 18 U.S.C. § 3582 in the event of a future retroactive

11

amendment to the Sentencing Guidelines which would affect the sentence.

25. If the defendant receives a sentence within or below the advisory guideline range, this plea agreement shall serve as the defendant's express directive to defense counsel to timely file a "Notice of Non-Appeal" following sentencing, signed by the defendant.

## VIOLATION OF AGREEMENT

26. The defendant understands that if he breaches any provision of this Plea Agreement, the United States will be free from any obligations imposed by this agreement, but all provisions of the agreement remain enforceable against the defendant. In the exercise of its discretion, the United States will be free to prosecute the defendant on any charges of which it has knowledge. In such event, the defendant agrees not to assert any objections to prosecution that he might have under the Sixth Amendment and/or Speedy Trial Act.

27. In addition, if the defendant is released from detention prior to sentencing, he understands that the United States will no longer be bound by this agreement if he violates any condition of his release prior to sentencing or prior to serving his sentence after it is imposed.

## ENTIRETY OF AGREEMENT

28. This document is the complete statement of the agreement between the defendant and the United States and may not be altered unless done so in writing and signed by all the parties.

Respectfully submitted,

12

Date: 3/13/17

KENYEN R. BROWN
UNITED STATES ATTORNEY

Vicki M. Davis, Criminal Chief
Assistant United States Attorney

Date: 3/10/17

Gloria A. Bedwell
Assistant United States Attorney

I have consulted with my counsel and fully understand all my rights with respect to the offense charged in the Indictment pending against me. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this agreement, and I voluntarily agree to it. I hereby stipulate that the Factual Resume, incorporated herein, is true and accurate in every respect, and that had the matter proceeded to trial, the United States could have proved the same beyond a reasonable doubt.

Date: 3/14/17

Willie John Wells
Defendant

I am the attorney for the defendant. I have fully explained his rights to him with respect to the offense(s) charged in the Indictment in this matter. I have carefully reviewed every part of this Plea Agreement with him. To my knowledge, his decision to enter into this agreement is an informed and voluntary one. I have carefully reviewed the Factual Resume, incorporated herein, with the defendant and to my knowledge, his decision to stipulate to the facts is an informed, intelligent and voluntary one.

Date: 3/14/17

Peter Madden, Esq.
Defense Counsel

13